UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA L. SHOEMATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:14 CV 32 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Cynthia L. Shoemate for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff was born on December 11, 1961. (Tr. 35.) She filed her Title II application on October 4, 2011, alleging an onset date of June 6, 2011, and alleging disability due to back pain and depression. (Tr. 78, 134-35, 157.) She protectively filed her Title XVI application on October 10, 2011. (Tr. 80, 136-41.) Her applications were denied initially, and she requested a hearing before an ALJ. (Tr. 78, 80.)

On March 25, 2013, following a hearing, the ALJ denied her applications. unfavorable decision. (Tr. 11-23.) The Appeals Council denied plaintiff's request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

Plaintiff was voluntarily admitted to Mid Missouri Mental Health Center for depression from August 19-22, 2005. (Tr. 403.) From January 22, 2007 to November 17, 2009, she was treated for outpatient medication management at the University of Missouri Health System's Psychiatry Clinic. (Tr. 502-17.) By November 17, 2009 she was doing well in terms of her mood and she denied any symptoms of depression. (Tr. 502.)

On April 23, 2010, an x-ray of plaintiff's lumbar spine showed mild degenerative changes in her lumbar spine with disc space narrowing and facet arthrosis or degenerative joint disease. (Tr. 239.)

On July 15, 2010, plaintiff saw family practitioner Andrea Eden, M.D. She increased plaintiff's gabapentin, an anticonvulsant and analgesic, for paresthesia or numbness or tingling in her left leg. (Tr. 313-15.)

On July 16, 2010, plaintiff underwent an MRI of her lumbar spine which showed mild lumbar spondylosis or degenerative osteoarthritis. (Tr. 230-31.)

On July 27, 2010, plaintiff saw orthopedist John D. Miles, M.D., for lower back pain that radiated down her right hip and lower extremity to her mid-calf, and that was more pronounced on the left side. Dr. Miles noted that plaintiff had developed a little instability in her lower spine with some facet arthropathy or arthritis, particularly on the left side with some resultant low back, left buttock, and leg pain. Her symptoms were of short duration, about seven or eight months. She received an epidural steroid injection and was instructed to return as needed. Dr. Miles strongly encouraged core strengthening exercises, weight loss, and aerobic conditioning. (Tr. 232-33.)

On September 27, 2010, plaintiff saw Steven Street, D.O., at the Boone Hospital Center Pain Management Clinic for a new patient evaluation. His impression was lumbar facet joint pain and left sacroiliac joint dysfunction and she was given steroid injections. (Tr. 271-72.) Plaintiff underwent another steroid injection on the left sacroiliac joint

performed by Dr. Street on October 7, 2010 and was instructed to return as needed. (Tr. 267.)

On November 1, 2010, plaintiff underwent a radiofrequency ablation, a procedure used to reduce pain in which an electrical current is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area. (Tr. 262.)

Plaintiff was given additional steroid injections by Bradford Ross Noble, D.O., at Boone Hospital on December 20, 2010, March 21, 2011, and May 11, 2011. (Tr. 247, 252, 257.)

On January 19, 2012, plaintiff saw Randy Foster, D.O., for a physical examination for Disability Determination. Dr. Foster stated because plaintiff had subjected herself to an epidural steroid injection, he believed that she had some lower back pain. He further stated "however, she is clearly dramatizing this to a greater or lesser degree." (Tr. 375.) Dr. Foster opined that plaintiff's rehabilitative potential was good, and therefore any disability would be minimal to none. In response to the State's specific questions regarding function, Dr. Foster saw no impairment in sitting, standing, walking, lifting, carrying or handling objects, hearing, speaking, or traveling. (Id.)

On January 25, 2012, plaintiff saw licensed psychologist Ruthie Moccia, Ed.S., for a psychological consultation for Disability Determinations. Ms. Moccia described plaintiff, among other things, as well oriented with intact memory and concentration abilities. Her impression included chronic post-traumatic stress disorder (PTSD), moderate major depressive disorder, and a history of sibling sexual abuse. She assigned a Global Assessment of Functioning (GAF) score of 60, indicating moderate symptoms. (Tr. 382-84.)

On January 31, 2012, medical consultant Michael Stacy, Ph.D., completed a mental RFC assessment. Dr. Stacy opined that plaintiff was moderately limited in 5 of 20 areas of functioning and had no limitations in 15 of 20 areas of functioning. Specifically, Dr. Stacy opined that plaintiff retained the ability to understand, remember, and carry out simple to moderately complex instructions; maintain attendance and sustain an ordinary

routine without special supervision; interact adequately with peers and supervisors; and adapt to changes in a work setting. (Tr. 400-02.)

On February 14, 2012, plaintiff saw licensed psychologist Mark W. Schmitz, M.S., for a psychological examination at the request of the Family Support Division of the Department of Social Services. Mr. Schmitz believed that plaintiff was suffering from a major depressive disorder, characterized by sad mood, frequent tearfulness, feelings of worthlessness, sleep and appetite disturbance, irritability, and concentration difficulties, and that she appeared to qualify for a diagnosis of social phobia. Mr. Schmitz believed that plaintiff had a mental disability that would significantly interfere with her ability to successfully maintain employment. He opined that plaintiff's poor concentration, irritability, and frequent tearfulness associated with her depression, as well as her anxiety in social situations, would likely impair her ability to keep a job. (Tr. 430-34.)

On July 1, 2012, plaintiff was seen at the emergency room of the University of Missouri Health Care for acute back pain. She was prescribed meloxicam, a non-steroidal anti-inflammatory drug, and acetaminophen for pain. (Tr. 456.)

On July 6, 2012, plaintiff was seen at University Physicians (UP)-Missouri Orthopedic Institute. She had good circulation to her extremities. She had some peripheral edema or swelling of the right lower extremity. She was tender to palpation over her lower spine and sacrum. She was tender to palpation over the greater trochanters, where the femur connects to the hip bone. She had decreased range of motion in her spine with flexion and extension secondary to pain, and increased pain with extension. She had some weakness on the left side. She also had some weakness with left knee flexion and extension. She was diagnosed with anterolisthesis, a forward displacement of a vertebral body with respect to the vertebral body immediately below it, due to congenital anomaly, degenerative change or other reasons. She had some decreased disc height, probable degenerative disc disease and some probable trochanteric bursitis. The plan was for her to receive an injection on the left side for the trochanteric bursitis. (Tr. 495-98.)

On July 26 2012, an MRI showed mild lumbar spondylosis or degenerative osteoarthritis of the joints, with moderate facet arthrosis, or arthritis that most significantly results in moderate left and mild-moderate right foraminal stenosis or narrowing. She was given another steroid injection in her left greater trochanteric bursa by Gavin Michael Vaughn, M.D. (Tr. 484-89.)

On August 30, 2012, plaintiff saw Greg Kuhns, M.D., at the UP-Interventional Pain Clinic for her back pain. He believed her pain was related to her spinal stenosis and therefore additional epidural injections would not be helpful. He planned to perform bilateral sacroiliac joint and piriformis injections. (Tr. 519-22.)

On December 17, 2012, psychiatrist Glenna C. Burton, M.D., completed a Mental RFC Form. Dr. Burton diagnosed recurrent major depression and PTSD. Dr. Burton believed that if plaintiff were employed, she would become overwhelmed and need to leave work early two to three days per week. Dr. Burton assessed plaintiff's mental ability to function on a sustained basis, 8 hours per day, five days per week, in a regular, competitive work setting with limitations that did not allow for performance for 15%, or more, during an 8-hour work day, excluding breaks, in all task areas. (Tr. 499-500.)

On December 31, 2012, plaintiff was seen at University Hospital Urgent Care Clinic for left sciatica pain. The plan included conservative treatment and she was prescribed Tramadol for pain. The Clinic stressed the need for a relationship with a primary care provider for ongoing pain management. (Tr. 527-30.)

On March 14, 2013, plaintiff saw pain specialist Ebby Varghese, M.D., at UP-Interventional Pain Clinic for pain in her tailbone. Dr. Varghese planned to do sacroiliac joint injections that day or the next and go from there. (Tr. 537-38.)

On April 22 and 30, 2013, plaintiff was seen at UP-Physical Medicine and Rehab for lower back pain. Osteopathic manipulation was performed and she was instructed to return in one to two weeks to assess the benefit of the manipulation. (Tr. 549-52.)

On July 7, 2013, plaintiff was seen at the University of Missouri Emergency Services with suicidal thoughts and worsening depression. She had run out of some of her

medications five days earlier and "things had gotten out of control since then." (Tr. 553.) She was cooperative. Her mood was depressed and tearful and her judgment was impaired by abnormal thoughts. She was admitted to Psychiatric Care as an inpatient, treated with Effexor XR, an antidepressant, and discharged on July 11, 2013. She was diagnosed with recurrent major depression. She was instructed to follow up in the aftercare program at Burrell Behavioral Health where she was treated until September 9, 2013. (Tr. 553-74, 578-97.)

**ALJ Hearing**

On February 28, 2013, plaintiff, then 51 years old, appeared and testified to the following at a hearing before an ALJ. (Tr. 30-70.) She was discharged from her last job in June 2011 due to poor attendance caused by her illnesses. She cannot work due to her back pain, depression, and medication. She is able to wash and dress herself and tend to her personal needs. On a typical day she reads, watches television, and uses her computer to check email or Facebook for about twenty minutes. She occasionally eats meals out and plays Yatzee a couple of times per month. She goes shopping every two weeks. She cleans dishes and makes her bed at times. She does laundry but does not vacuum, sweep, or take out the garbage. She has a driver's license and drives about twice a month. She used to attend her husband's bowling league two or three times per week, but now goes only about once a week. (Tr. 40-49.)

She takes Cymbalta, an antidepressant, for depression and pain, although it does not really help with the pain. She also takes Wellbutrin, an antidepressant, and Trazodone to help her sleep. She has difficulty sleeping due to her pain. She takes prescription medication for nightmares and anxiety, some of which cause fatigue. She has pain in her hip and back that sometimes radiates into her lower back. Her hip pain is a separate, sharp pain that occurs daily and is relieved by changing positions, medication, and lying down. The pain is exacerbated by walking, standing, and sitting for extended periods of time.

She has steroid injections every 3 to 6 months, which initially help but eventually wear off. (Tr. 51-55.)

Dr. Varghese, a pain management doctor, has treated her for her pain. She seeks care in the emergency room when her pain is acute but does not see an orthopedist on a regular basis. Despite her pain, she does not take pain medication on a regular long term basis and has not discussed this with her doctor. Her psychiatrist, Dr. Glenna Burton, has treated her for her depression and PTSD for two and one half years. She does not see a therapist on a regular basis. On bad days, which occur two or three times per week, she wants to remain in bed. She gets anxious around groups of people. She has no problems with her concentration but sometimes needs to reread something several times before she can remember it. (Tr. 55-57.)

She can sit for 40 minutes and stand for 20 minutes. She cannot lift a full pot of coffee. She has had about twelve steroid shots in her back which provide pain relief for up to six weeks and allow her to take less pain medication. She sometimes naps twice a day for an hour and a half at a time. She goes to bed at 8:30 p.m. on bad days when she is in a lot of pain or depressed. Her concentration, memory, and ability to be comfortable sitting or standing is affected on those days. (Tr. 58-61.)

She was sexually abused as a teenager. She still has flashbacks and nightmares, causing anxiety and a decrease in concentration and energy. She must take antianxiety medication before going to places such as Walmart. (Tr. 61-62.)

Vocational Expert (VE) Steven Kuhn also testified to the following at the hearing. The VE was asked about a hypothetical individual with the same age and education as plaintiff who was limited to light work, must avoid concentrated exposure to vibration and hazards such as unprotected heights and dangerous machinery, and who was limited to simple and routine work with occasional contact with supervisors, coworkers, and the general public. The VE testified that the individual would be unable to perform her past relevant work. However, other work would be available such as production worker and laundry worker.

When asked about another hypothetical individual with additional limitations in which the individual must be able to sit and stand at will for brief periods of time not to exceed five minutes in order to adjust position, up to three times during the workday, the VE testified that those same jobs would be available. When asked further about the same hypothetical individual who was off task 20% of the time due to side effects from medication, and who would not be able to maintain work as it is typically performed, the VE testified that those jobs would not be available. (Tr. 68-69.)

### III. DECISION OF THE ALJ

On March 23, 2013, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 11-23.) The ALJ found that plaintiff had not engaged in substantial gainful activity since her June 6, 2011 alleged onset date. The ALJ found that plaintiff had the severe impairments of lumbago (low back pain), bipolar disorder, major depressive disorder, and PTSD. However, the ALJ found plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in the listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 13-16.)

The ALJ determined that plaintiff had the RFC to perform a range of light work as defined in the regulations. She should avoid all exposure to vibrations and hazards, such as unprotected heights and dangerous machinery. She could perform simple and routine work and could tolerate occasional contact with supervisors, co-workers, and the public. (Tr. 16-17.) The ALJ concluded that plaintiff's impairments precluded her from performing any of her past work. However, plaintiff had the RFC to perform the requirements of production worker, hand packer, and laundry worker. Accordingly, the ALJ found plaintiff was not disabled under the Act. (Tr. 21-23.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform PRW. Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

# V. DISCUSSION

Plaintiff claims the ALJ erred in weighing the opinions of treating psychiatrist, Dr. Glenna Burton, state agency psychologist Mark W. Schmitz, M.S., and non-examining medical consultant Michael Stacy, Ph.D. This court disagrees.

### Treating Psychiatrist Dr. Glenna Burton

Plaintiff argues the ALJ erred in weighing the opinion of treating psychiatrist Dr. Glenna Burton. She contends that Dr. Burton's two written assessments that plaintiff is disabled are supported by medically acceptable clinical diagnostic techniques and by her own treatment notes. She asserts that, because the ALJ did not give more weight to Dr. Burton's opinion, she improperly relied on her own medical opinion in formulating plaintiff's RFC.

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Likewise, an ALJ may appropriately rely on non-examining opinions as part of the RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id. at 936 (ALJ's task is to resolve conflicts in the evidence).

In this case, the ALJ properly considered Dr. Burton's statements and found them entitled to little weight. Dr. Burton completed a medical questionnaire form prepared by plaintiff's attorney. (Tr. 499-500.) Dr. Burton noted that plaintiff was diagnosed with major depression disorder and PTSD. She opined that plaintiff would likely arrive to work late or leave work early two or more days per week because she was afraid to go into public places and did not handle stress well.

Through a series of checked boxes, Dr. Burton opined that plaintiff was unable to perform the following tasks for 15 percent or more of an 8-hour workday: remember locations and work-like procedures due to poor concentration; understand and remember short and simple instructions due to poor concentration; maintain attention and concentration for extended periods, (i.e., 2 hours), due to anxiety and depression; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances due to pain and depression; sustain an ordinary routine without special supervision due to depression; complete a normal workday and workweek without interruptions from psychologically based symptoms and without an unreasonable number and length of rest periods; interact appropriately with the general public due to fear from PTSD; accept instructions and respond appropriately to criticism from supervisors due to depression and the fact that she is "very sensitive"; get along with coworkers or peers without distracting them or exhibiting behavioral extremes as other people would be distracted by her hypervigilance; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness due to her anxiety and fearfulness. (Tr. 499-500.)

The ALJ discounted Dr. Burton's opinion because it was inconsistent with other record evidence. (Tr. 18.) See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). The ALJ noted that the extreme limitations set forth in Dr. Burton's opinion were inconsistent with the record evidence. (Tr. 20.) In particular, Dr. Burton's opinion was inconsistent with plaintiff's mental status examinations, which consistently indicated that plaintiff was pleasant and cooperative, appeared alert and oriented, had normal intellect, intact memory, good eye contact, normal speech, normal thought processes, adequate concentration, and normal judgment. (Tr. 315, 317, 320, 323, 329, 332, 335, 338, 349, 353, 432-33, 447, 457, 521, 529, 535, 538, 542, 563-64, 566, 569, 573-74, 578, 581, 584, 588, 593, 596.) Consequently, the ALJ determined that Dr. Burton's opinion that plaintiff had disabling work-related limitations

was not entitled to controlling weight because it was inconsistent with the record evidence. (Tr. 20.) See Davidson v. Astrue, 501 F.3d 987, 991 (8th Cir. 2007) (appropriate finding of inconsistency with other evidence alone is sufficient to discount a treating physician's RFC). Because Dr. Burton's opinion was not entitled to controlling weight, the ALJ then weighed this evidence with the rest of the record, ultimately giving little weight to Dr. Burton's opinion. (Tr. 20.)

In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ. See 20 C.F.R. §§ 404.1527(c)(1)-(6); 416.927(c)(1)-(6); Owens v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008) (when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors when assessing the weight to give it). Although an ALJ is not required to discuss all the factors in determining what weight to give a physician's opinion, she must explain the weight she gave the opinion and give "good reasons" for doing so. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ gave "good reasons" here. The ALJ determined that Dr. Burton's opinion was inconsistent with her own treatment notes. (Tr. 20.) See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (ALJ may discount a treating physician's opinion if it is not supported by the doctor's own treatment records.) Here, Dr. Burton's treatment notes painted a very different picture of plaintiff's mental condition. (Tr. 348-54, 447-49, 501.) Specifically, notes from December 2010 to June 2011 showed that plaintiff was "doing very well," that "life [was] better," that she was "less depressed and less anxious," and that her "mood [was] good." (Tr. 348-54.) Dr. Burton also noted that plaintiff's anxiety and depression improved with medication. (Tr. 350.) Dr. Burton's findings do not support her opinion that plaintiff had disabling work-related limitations. Because Dr.

Burton's opinion was inconsistent with her own treatment notes, the ALJ properly gave it less weight.

Dr. Burton's findings were also inconsistent with plaintiff's own statements. For example, Dr. Burton attributed some of her findings to plaintiff's poor concentration, specifically noting that plaintiff could not maintain attention and concentration for two hours. (Tr. 500.) However, plaintiff stated in her function report that she could pay attention for at least two hours unless she was experiencing pain. (Tr. 192.) In addition, Dr. Burton opined that plaintiff was afraid to go out in public and had problems interacting with people due to a fear of others. (Tr. 499-500.) However, plaintiff's record statements indicate she has some difficulty getting along with others, but that she was able to shop, spend time with family and friends, and attend her husband's bowling league, albeit less frequently than she used to. (Tr. 49, 191-92, 383.) Such evidence does not support Dr. Burton's opinion. This court therefore concludes that because Dr. Burton's opinion was inconsistent with plaintiff's testimony, the ALJ properly gave it less weight.

**Non-Examining Medical Consultant Michael Stacy, Ph.D.**

Plaintiff questions the "considerable" weight the ALJ afforded the opinion of non-examining medical consultant Michael Stacy, Ph.D. (Tr. 19.) On January 31, 2012, Dr. Stacy completed a mental RFC assessment in which he opined that plaintiff was moderately limited in 5 of 20 areas of functioning and had no limitations in 15 of 20 areas of functioning.

The examining relationship is one of many factors the ALJ may consider in weighing medical opinions. See 20 C.F.R. §§ 404.1527(c)(2)(ii)(1)-(6), 416.927(c)(2)(ii)(1)-(6). While the agency generally gives more weight to the opinion of a treating physician than a non-examining physician, it is not always required to do so when the opinion of the non-examining physician is consistent with the medical and non-medical evidence in the record. See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2); SSR 96-2p ("In appropriate circumstances, opinions from State agency medical and

psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

In contrast to the ALJ's treatment of Dr. Burton's opinion, the ALJ noted that Dr. Stacy's opinion was consistent with plaintiff's medical history, which consistently showed unremarkable mental status examinations and improvement with medication. (Tr. 19-20, 315, 317, 320, 323, 329, 332, 335, 338, 348-50, 353, 432-33, 435, 447, 457, 521, 529, 535, 538, 542, 562-64, 566, 569, 573-74, 578, 581, 584, 588, 593, 596.) The ALJ noted that Dr. Stacy's opinion was consistent with plaintiff's self-reported daily activities, which included attending to her personal care, preparing meals, performing household chores, going outside daily, driving, walking, shopping, managing her finances, watching wildlife in their habitat, reading magazines, watching television, playing board games, using a computer for social networking and email, spending time with family and friends, and attending her husband's bowling league. (Tr. 19-20, 39-49, 60, 187-96, 383, 400-02.) Because Dr. Stacy's opinion was consistent with the medical and non-medical record evidence, the ALJ properly gave more weight to Dr. Stacy's non-examining opinion than she gave to Dr. Burton's as a treating physician. See SSR 96-2p ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

**State Agency Licensed Psychologist Mark W. Schmitz, M.S.**

Plaintiff also claims the ALJ erred in weighing the opinion of state agency psychologist Mark W. Schmitz, M.S. The ALJ considered Mr. Schmitz's opinion but determined that some of his findings were not supported by objective medical evidence. (Tr. 20.) Mr. Schmitz examined plaintiff once and conducted a mental status examination. He noted that plaintiff appeared alert and oriented, had normal speech, well-formulated thoughts, good eye contact, intact memory, and normal judgment. She also performed basic calculations and interpreted common proverbs correctly. Despite his normal

findings, Mr. Schmitz opined that plaintiff's impairments interfered with her ability to successfully maintain employment and impaired her ability to maintain employment. (Tr. 430-34.) He did not, however, cite objective medical findings to support his opinion that plaintiff had disabling mental problems. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (ALJ may give treating doctor's opinion limited weight if it provides conclusory statements only, or is inconsistent with the record). Because Mr. Schmitz's opinion was not supported by objective medical evidence and was inconsistent with the record evidence, including his own mental status examination findings, this court concludes that the ALJ properly gave it little weight. Moreover, Mr. Schmitz's belief concerning plaintiff's ability to work was not a medical opinion, but an opinion on an issue exclusively reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d) (an opinion on the ultimate issue of disability is not a medical opinion, and is not entitled to any "special significance").

Plaintiff finally argues that the ALJ's decision to discredit the opinions of Dr. Burton and Mr. Schmitz means that there is no medical evidence to support the ALJ's decision. She also suggests the ALJ formed her own opinion of the medical evidence. This argument fails. There is no requirement in the regulations for an ALJ to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians in determining the claimant's RFC. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (citations omitted). An ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). The ALJ fulfilled this duty and determined plaintiff's RFC based on all of the evidence, including the opinions of Mr. Schmitz and Drs. Burton, Stacy, and Foster. (Tr. 19-20.) See Ellis v. Barnhart, 392 F.3d 988, 999 (8th Cir. 2005) (while medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner).

In sum, the court concludes the ALJ properly evaluated the opinion evidence in this case in accordance with the Commissioner's rules and regulations. The ALJ considered all of the medical opinions, discussed the weight she gave each opinion, and provided good reasons for doing so. Cf. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence).

## VI. CONCLUSION

This court concludes substantial evidence on the record as a whole supports the Commissioner's decision. Accordingly, for the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


                                          S/ David D. Noce
                                **UNITED STATES MAGISTRATE JUDGE**

Signed on February 2, 2015.